## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 15 |
| NEWSAT LIMITED, *et al.*,[1] | Case No. 15-_____ (___) |
| Debtors in a Foreign Proceeding. | (Joint Administration Requested) |

## VERIFIED PETITION FOR RECOGNITION OF AUSTRALIAN
## ADMINISTRATION PROCEEDINGS AND RELATED RELIEF

Stephen James Parbery and Marcus William Ayres, of PPB Advisory in Sydney, Australia, are the duly appointed and acting joint and several administrators (the "**Administrators**") and foreign representatives of NewSat Limited ("**NewSat**"), NSN Holdings Pty Ltd., NewSat Services Pty Ltd., Jabiru Satellite Holdings Pty Ltd., NewSat Space Resources Pty Ltd., NewSat Networks Pty Ltd., and Jabiru Satellite Ltd. (collectively, the "**NewSat Debtors**") in administration proceedings (together, the "**Australian Proceeding**") under Australia's *Corporations Act 2001* (Cth) (as amended, the "**Corporations Act**") subject to the supervision of the Federal Court of Australia and Supreme Court of New South Wales (together, the "**Australian Courts**").

The Administrators have commenced these chapter 15 cases ancillary to the Australian Proceeding and respectfully file this *Verified Petition for Recognition of Australian Administration Proceedings and Related Relief* (the "**Chapter 15 Petition**"), with accompanying documentation, pursuant to sections 1504 and 1515 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") seeking the entry of an order substantially in the form annexed hereto as Exhibit A (the "**Proposed Order**") recognizing the Australian Proceeding as a "foreign main proceeding"

---

[1]    The last four digits of the Australian Company Number for each debtor follow in parentheses:  NewSat Limited (7303); NSN Holdings Pty Ltd. (3263); NewSat Services Pty Ltd. (8708); Jabiru Satellite Holdings Pty Ltd. (7800); NewSat Space Resources Pty Ltd. (9943); NewSat Networks Pty Ltd. (4994); and Jabiru Satellite Ltd. (7365).

under section 1517 of the Bankruptcy Code and granting such other relief as is appropriate in the circumstances.

Contemporaneously with the filing of the Chapter 15 Petition, the Administrators have filed an *Emergency Motion for a Temporary Restraining Order, and After Notice and a Hearing, a Preliminary Injunction, Pursuant to Sections 1519, 105(a), 362 and 365 of the Bankruptcy Code* (the "**Provisional Motion**") seeking (i) the immediate entry, on an *ex parte* basis, of a temporary restraining order staying execution against the assets of the NewSat Debtors, applying sections 362 and 365 of the Bankruptcy Code in these cases on a provisional basis, and scheduling a hearing on the Administrators' request for a preliminary injunction, and (ii) after such hearing, the entry of a preliminary injunction extending the relief in the temporary restraining order until the final disposition of the Chapter 15 Petition.

In support of the Chapter 15 Petition, the Administrators respectfully state as follows:

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, section 1501 of the Bankruptcy Code, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).  Venue is proper in this District pursuant to 28 U.S.C. § 1410(1) and (3) because the principal asset of NewSat in the United States is the shares of capital stock it owns in NewSat America Inc., a Delaware corporation, which is deemed to be located in Delaware, and, with respect to the other NewSat Debtors, venue in this District is consistent with the interests of justice and convenience of the parties, having regard for the relief sought by the Administrators.  The statutory predicates for the relief requested herein are sections 105(a), 1504, 1507, 1515, 1517, 1520 and 1521 of the Bankruptcy Code.

01:16960555.6

# BACKGROUND

*The NewSat Debtors*

A.    Business

1.    NewSat was founded in 1987 as a multimedia business and gradually evolved into a satellite communications company.[2]   The NewSat Debtors and their non-debtor affiliates (collectively, the "**NewSat Group**") are now Australia's largest pure-play satellite communications company, with teleports and satellites delivering internet, voice, data and video communications coverage to 75% of the globe, including Australia, Asia, the Middle East, Africa, Europe and the United States.[3]   Most of the NewSat Group's key customers are in the resources, defense, government, construction, maritime, aeronautical, media, and telecommunications industries.[4]

2.    In 2002, the NewSat Group was primarily a satellite "solutions provider" offering satellite design and delivery expertise to ensure communications continuity for its clients.[5]   In this capacity, the NewSat Group provided internet, voice, data and video connectivity to government and private sector clients in remote, hard to reach locations and temporary mobile sites.[6]   In 2005, through the acquisition of key satellite infrastructure, the NewSat Group became a "teleport operator" enabling it to acquire a larger and potentially more valuable global customer base.[7]   The NewSat Group's teleports in Perth and Adelaide, Australia are accredited to supply services to the Australian Department of Defence and are recognized as highly secure global access points, supporting certified classified networks capable of transmitting vital and sensitive information for government clients.[8]   The teleport business has suffered in recent years due to the loss of renewal contracts from a U.S.-based

---

[2]    *NewSat*, http://en.wikipedia.org/wiki/NewSat, visited April 13, 2015.
[3]    NewSat Limited Annual Report 2014 dated September 30, 2014 (the "**2014 Annual Report**") at 2,6.
[4]    *Id*. at 2.
[5]    *Id*.
[6]    *Id*. at 6.
[7]    *Id*. at 2.

partner as a result of the U.S. government withdrawal from Afghanistan.[9]  As a consequence, the NewSat Group implemented a series of cost-cutting measures in the teleport business to better align costs with expected future revenues.[10]

3.    While the teleport business is, and will continue to be, a source of revenue, the NewSat Group pursued a strategy of expanding from a teleport operator, capturing and reselling satellite capacity, into a vertically integrated owner and operator of communication satellites.[11]  Beginning in 2011, the NewSat Group acquired rights to multiple orbital slots providing the necessary platform to become a "satellite operator."[12]  By undertaking investment in the Jabiru-2 payload ("**Jabiru-2**") hosted on the MEASAT 3-b satellite and the construction of its own commercial satellite named Jabiru-1 ("**Jabiru-1**"), the NewSat Group commenced a strategic growth project to launch a fleet of next-generation geostationary satellites targeting high growth markets with valuable customer bases and capitalizing on existing client relationships from the teleport business.[13]

4.    On September 12, 2014, Jabiru-2 launched on Flight VA218, an Ariane 5 ECA launch vehicle, from the European Spaceport in French Guiana.[14]  Jabiru-2 delivers "Ku-Band" capacity across Australia, Timor Leste, Papua New Guinea and the Solomon Islands, and provides connectivity to the resources, commercial mobility, media, telecommunications and government sectors.[15]  The closing of a $11.7 million (USD) contract with a leading global systems integrator indicates demand for Jabiru-2 capacity.[16]

---

[8]    *Id.* at 6.
[9]    *Id.* at 3, 25.
[10]    *Id.* at 3, 4.
[11]    *Id.* at 3-4, 9.
[12]    *Id.* at 2.
[13]    *Id.* at 2, 27.
[14]    *Id.* at 5.
[15]    *Id.* at 6.
[16]    *Id.* at 5, 28.

01:16960555.6

5.      If completed and launched, Jabiru-1 will be Australia's first commercial "Ka-band" satellite and is expected to deliver 7.6 GHz of new capacity in the covered regions.[17] Jabiru-1 is a large, next-generation satellite with the potential to provide coverage over South East Asia, the Middle East and North Africa.[18]  It is currently being built by the Lockheed Martin Corporation ("**Lockheed Martin**") with the goal of launching in the 2015-2016 period.[19]  Jabiru-1 is intended to be launched by Arianespace S.A. ("**Arianespace**") on the same Ariane 5 launch vehicle as Jabiru-2, which has over 60 successful consecutive launches.[20]  Recent NewSat Group projections indicate that the total Jabiru-1 project cost is expected to be $600 million (USD), including $116 million (USD) for the rocket to put the satellite in orbit.  As of the most recent annual report for the fiscal year-ended June 30, 2014, the NewSat Group had secured $644 million (USD) of pre-launch customer contracts.[21] As discussed more fully below and in the Provisional Motion, the Australian Proceeding and these ancillary cases have been commenced at this time since relief is needed on an urgent basis to preserve the value of the Jabiru-1 project.

B.      Equity Structure

6.      NewSat is registered and incorporated in Australia and is the direct or indirect parent of the other NewSat Debtors.  Its shares are publicly listed on the Australian Stock Exchange (ASX:NWT) but NewSat voluntarily requested a trading halt on March 26, 2015 as a result of ongoing negotiations with its lenders in relation to the Jabiru-1 project financing.  NSN Holdings Pty Ltd., NewSat Services Pty Ltd., Jabiru Satellite Holdings Pty Ltd., and NewSat Space Resources Pty Ltd. are registered and incorporated in Australia.  All four companies are direct subsidiaries of NewSat. NewSat Networks Pty Ltd. and Jabiru Satellite Ltd. are also Australian companies and are direct

---

[17]    *Id*. at 6.
[18]    *Id*.
[19]    *Id*. at 9, 26.
[20]    *Id*. at 5.

subsidiaries of NSN Holdings Pty Ltd. and Jabiru Satellite Holdings Pty Ltd., respectively. NewSat is also the direct parent of non-debtor entities NewSat America Inc., NewSat Cyprus Ltd., and NewSat Pte Ltd. (Singapore). An illustration of the NewSat Group organizational structure is provided below.



C.    Debt Structure

7.    Jabiru Satellite Ltd. ("**JSL**") is the borrower and the other members of the NewSat Group are guarantors under three key debt facilities that provide funding for the capital costs of the Jabiru-1 satellite project. Pursuant to that certain *COFACE Facility Agreement*, dated July 4, 2013, with Société Générale S.A., Credit Suisse (Luxembourg) S.A., and Standard Chartered Bank as lenders, and Compagnie Française d'Assurance pour le Commerce Extérieur ("**COFACE**"), the French export credit agency, as guarantor (the "**COFACE Facility**"), the NewSat Group received a total commitment of $89.6 million (USD) to finance the purchase of French goods and services, including principally the launch vehicle-related costs for the Jabiru-1 satellite in connection with a launch services agreement with Arianespace. Under that certain *Reserve Facility Agreement*, dated July 4, 2013, with Standard Chartered Bank (the "**Reserve Facility**"), the NewSat Group received a total commitment of $25 million (USD) to pay miscellaneous project costs as they may arise.

---

[21]    *Id.* at 5.

8.    Pursuant to that certain *First Amended and Restated Credit Agreement*, dated January 14, 2014, with the Export-Import Bank of the United States (the "**Ex-Im Bank Facility**," and together with the COFACE Facility and the Reserve Facility, the "**Credit Agreements**"), the NewSat Group received a total commitment of approximately $300.5 million (USD) to finance the purchase of goods and services in the United States, including principally the construction of Jabiru-1 by Lockheed Martin.  In an *Amended and Restated Common Terms Agreement*, dated July 4, 2013 (as amended, the "**Common Terms Agreement**"), the parties set out standard terms generally applicable to the Credit Agreements.

9.    Pursuant to those certain *General Security Deeds*, each dated July 4, 2013, the NewSat Debtors individually pledged all or substantially all of their assets, including, where applicable, all shares held in other entities in the NewSat Group (the "**General Security Deeds**") in favor of Citicorp International Limited as security trustee (the "**Security Trustee**") to secure their obligations under the Credit Agreements.  A *Security Trust Deed*, dated July 4, 2014, empowers the Security Trustee to take enforcement actions with respect to collateral securing the NewSat Group's obligations under the Credit Agreements.  However, the Security Trustee is only authorized to pursue enforcement actions at the direction of Deutsche Bank Trust Company Americas (the "**Intercreditor Agent**") which acts on behalf of secured creditors, and on their instruction, under the terms of the *Amended and Restated Intercreditor Deed*, dated January 24, 2014 (as amended, the "**Intercreditor Deed**").

D.    <u>Assets</u>

10.    As of December 31, 2014, the date of the NewSat Group's most recent consolidated financial statements, the NewSat Group had assets with a book value of approximately

$542 million,[22] including cash and cash equivalents of $21.4 million, property plant and equipment valued at $8.4 million, and intangible assets and goodwill valued at $493.2 million and comprised primarily of intangible satellite assets.[23] However, barring a successful reorganization enabling the completion of Jabiru-1, the fair value of the NewSat Group assets is likely to be materially less than book value, and significantly less than amounts owing in respect of outstanding liabilities.

E.    Key Contracts

11.    NewSat and JSL are party to a New York law governed contract with Lockheed Martin for the construction and delivery of Jabiru-1, dated December 8, 2011 (as amended, the "**Satellite Construction Contract**").  The total cost of the Satellite Construction Contract is $266.6 million (USD), payable according to a schedule based on specific construction and progress milestones. The NewSat Group has already paid approximately $170 million (USD) on account of the Satellite Construction Contract.   Construction of Jabiru-1 is taking place at Lockheed Martin's facilities in Denver, Colorado, and significant progress has been made to date.   As of January 2015, payment milestone no. 24 has been completed, representing a substantial portion of the physical construction of Jabiru-1, as the majority of the remaining payment milestones involve testing and/or the launch of Jabiru-1.

12.    NewSat is party to a $115.5 million (USD) French law governed launch services agreement with Arianespace, dated December 8, 2011 (as amended, the "**Launch Services Agreement**"), for the launch of Jabiru-1 into its proper orbital position aboard an Ariane 5 launch vehicle. Further, NewSat and MEASAT Satellite Systems Sdn. Bhd. ("**MEASAT**") have entered into several English law governed agreements (the "**MEASAT Agreements**") under which, (i) JSL will sell the MEASAT-3c payload (that is part of Jabiru-1) to MEASAT, (ii) MEASAT will provide tracking,

---

[22]    Unless specifically noted otherwise, all dollar amounts are reflected in Australian dollars.
[23]    NewSat Limited Half Year Report 2015 dated February 27, 2015 at Pgs. 7, 17.

telemetry, command and ranging operations for Jabiru-1, and (iii) MEASAT will grant JSL the exclusive right to use its radio frequency assignments at MEASAT's orbital slot.  The MEASAT Agreements are subject to a master agreement which provides that they are all intended to be read together and, *inter alia*, includes cross-default and cross-termination provisions among the MEASAT Agreements.

13.     Finally, the NewSat Group has entered into contracts with material customers, including, TrustComm Inc., Quick Link Communications, Ramin General Trading & Contracting Co., Shree Bhuvaneshwari Infra Holdings Pvt Ltd, and 3A Technologies (collectively, the "**Material Customer Contracts**") to provide satellite capacity from Jabiru-1.  The Material Customer Contracts are significant pre-launch commitments from customers to purchase bandwidth on Jabiru-1 once it is launched and operational.  For example, each of the contracts with Quick Link and 3A Technology has annual fees totaling approximately $13.4 million (USD) with terms of three and ten years, respectively.

F.     Operations and Center of Main Interests

14.     All the NewSat Debtors are organized under the laws of Australia with registered offices at Level 4, 6 Riverside Quay, Southbank Melbourne, Victoria 3006 Australia.[24] While the NewSat Group has facilities in Australia, Pakistan, Singapore and the United States, its head office is located in Victoria, Australia (the "**Victoria Head Office**").[25]  Further, a review of the 2014 Annual Report suggests that nearly all of the NewSat Group executive management team is located in Australia.[26]

---

[24]   2014 Annual Report at 90.
[25]   *Id.*
[26]   *Id.* at 21-23.

*Litigation in the United States*

         15.    A search of all federal and state courts in the United States did not identify any pending litigation involving the NewSat Debtors.

*Events Leading to the Australian Proceeding*

    A.    <u>Financial Difficulties</u>

         16.    As a result of certain defaults, cost overruns on the Jabiru-1 satellite project, and management issues, the lenders under the Ex-Im Facility and the COFACE Facility (collectively, the "**ECA Lenders**") acted upon their rights to stop further disbursement under their loan agreements.  The NewSat Group has not been able to raise sufficient new capital which has resulted in a liquidity problem.  On August 25, 2014, the ECA Lenders approved a conditional waiver to continue with the Jabiru-1 project.[27]  Following the satisfaction of all waiver conditions, the ECA Lenders agreed to recommence debt drawdowns for the Jabiru-1 project.[28]  The conditions of the wavier required the NewSat Group to raise $20 million (USD) in equity or mezzanine debt prior to September 30, 2014, and cumulatively $40 million (USD) prior to November 30, 2014.[29]  Further conditions to the ECA Lenders' waiver included (among others): (i) the appointment of three additional independent directors to the board of directors as required by Australian Stock Exchange rules, (ii) the appointment of a replacement chief financial officer, and (iii) the implementation of certain corporate governance recommendations made by an independent consultant.[30]  In a press release dated October 2, 2014, NewSat provided an update that a chief financial officer and two independent directors were appointed and that it was in the process of implementing recommended changes to its corporate governance.[31]  With respect to funding, NewSat announced that it had raised $10 million comprised of $6 million of

---

[27]   2014 Annual Report at 50.
[28]   *Id.*
[29]   *Id.*
[30]   *Id.*

01:16960555.6

equity and $4 million of mezzanine loan funds bearing 11% interest.[32]  Ultimately, the NewSat Group failed to satisfy the conditions of the waiver, breached covenants, and remains in default under the Credit Agreements.  Negotiations with the ECA Lenders have been ongoing.

17.    Due to the financial difficulties the NewSat Group experienced in 2014, the NewSat Group failed to make payments when due and owing under both the Satellite Construction Contract and the Launch Services Agreement, imperiling the continued existence of both agreements and the successful completion of Jabiru-1.  On December 16, 2014, Lockheed Martin issued a default notice due to overdue payments from the Satellite Construction Contract totaling over $21 million (USD).   After expiration of the period to cure the payment default, on January 22, 2015, Lockheed Martin issued a termination notice indicating its intent to cease construction of Jabiru-1.  However, under the terms of the Satellite Construction Contract, termination will not occur until the expiration of an additional cure period available to the ECA Lenders, which is currently scheduled for May 22, 2015.  However, the Administrators understand that Lockheed Martin may believe that it is entitled to an earlier termination date, and in any event, Lockheed Martin can take the position that the commencement of the Australian Proceeding constitutes a separate default under the express terms of the Satellite Construction Contract.  To that end, the NewSat Group is party to many other leases and contracts that may contain similar provisions and would be jeopardized if counterparties sought to enforce rights to termination.

18.    Further, Arianespace issued its own default notice to NewSat on February 25, 2015, due to overdue payments under the Launch Services Agreement totaling over $42 million (USD).  On April 3, 2015, Arianespace issued a termination notice to JSL which pursuant to the terms of the Launch Services Agreement could result in termination as early as Mary 3, 2015.  On

---

[31]    NewSat Limited Press Release, *Waiver Conditions and Capital Raising Update*, October 2, 2014.

[32]    *Id*.

April 14, 2015, the Security Trustee responded with a letter to Arianespace noting, *inter alia*, that notice of termination is only effective when it is received by the Security Trustee and marked directly to the attention of certain parties.   The termination of any of these key contracts would have a cascading and devastating effect on the financial condition of the NewSat Group to the detriment of all stakeholders.

        B.      <u>Mismanagement of the NewSat Group</u>

        19.      Amidst these financial difficulties, allegations of mismanagement at the NewSat Group came to light.   Such allegations of impropriety include (i) abuse of expense policies by certain executives, (ii) improper disclosure and allocation of related party transactions, and (iii) substantial payments to a yacht company part-owned by the NewSat Group's founder and chief executive, Mr. Adrian Ballantine, and several other past and present board members.[33]   Further, one of the NewSat Group's customers, TrustComm Inc., filed a lawsuit against NewSat and NewSat America, Inc. in Virginia alleging a $10 million fraud.[34]   In addition, the NewSat Group's external auditor, Ernst & Young LLP, declared there to be "significant uncertainty as to whether the Group will continue as a going concern."[35]

---

[33]    Richard Baker, Nick McKenzie, & Lucy Battersby, *Satellite Company NewSat Executives' Spending Flies High*, The Sydney Morning Herald (February 28, 2015, 12:15 AM), http://www.smh.com.au/business/satellite-company-newsat-executives-spending-flies-high-20150227-13qcef.html.

[34]    *Id*.  NewSat noted in a press release dated March 2, 2015, *Response to Media Coverage*, that it demanded withdrawal of the claim and that the parties were in the process of agreeing to a process to dismiss the suit in favor of a private mediation.  In a press release dated April 8, 2015, *Corporate and Jabiru-1 Update*, NewSat confirmed that the lawsuit was dismissed without prejudice "in favor of mediation to be held in Melbourne, Australia."  A review of the docket for the Circuit Court of Stafford County Virginia indicates that the lawsuit was dismissed on March 5, 2015.

[35]    Richard Baker, Nick McKenzie, & Lucy Battersby, *NewSat High Flyer Dangerously Close to Burning His Boats*, The Sydney Morning Herald (February 28, 2015), http://www.smh.com.au/business/newsat-high-flyer-dangerously-close-to-burning-his-boats-20150227-13q58p.html.

01:16960555.6

*The Australian Proceeding*

A.    <u>The Australian Administration</u>

20.    On April 16, 2015, the Security Trustee, upon instruction of the Intercreditor Agent and pursuant to the Intercreditor Deed, exercised its right under section 436C(1) of the Corporations Act to appoint the Administrators as administrators of the NewSat Debtors.[36]  The Security Trustee exercised this right due to the occurrence of certain events of default that have occurred and are continuing under the Common Terms Agreement and other finance documents.  Such defaults include, but are not limited to, the event of default arising under section 14.1 of the Common Terms Agreement for failure to make payments when due and owing under the Ex-Im Facility, numerous events of default arising under sections 14.3 and 14.4 for failure to comply with certain covenants in the Common Terms Agreement and waivers in connection thereto, and the event of default arising under section 14.17(d) of the Common Terms Agreement for failure to make payments under the Satellite Construction Contract and the Launch Services Agreement.

21.    The appointment of the Administrators commenced the Australian Proceeding and resulted in an automatic moratorium on the rights of creditors to, *inter alia*, commence or continue suits against the NewSat Debtors and their respective properties.[37]  The Australian Proceeding is designed to (i) maximize the chances of the NewSat Group to continue in existence for the benefit of creditors; or (ii) if that is not possible, provide a mechanism for the immediate winding up of the company.[38]  Although appointed by the Security Trustee, the Administrators are independent

---

[36]    A copy of the *Notice of Appointment of Voluntary Administrators to NewSat Limited and the Companies Listed in the Schedule*, dated April 16, 2015, applicable to each of the NewSat Debtors, including evidence of delivery, is attached hereto as <u>Exhibit B</u> in accordance with section 1515(b)(3) of the Bankruptcy Code.

[37]    *Declaration of Leonard Martin McCarthy in Support of (i) Administrators' Verified Petition for Recognition of Australian Administration Proceedings and Related Relief; and (ii) Administrators' Motion for Joint Administration, and (iii) Administrators' Emergency Motion for Temporary Restraining Order, and After Notice and a Hearing, a Preliminary Injunction Pursuant to Sections 1519, 105(a), 362 and 365 of the Bankruptcy Code*, dated April 16, 2015 (the "**McCarthy Declaration**"), at ¶ 21.

[38]    *Id*. at ¶ 11.

of secured lenders and owe general duties to all creditors.[39]  The powers of the NewSat Debtors' directors and officers are suspended and vested in the Administrators, and only the Administrators may deal with the NewSat Debtors' property during the administration.[40]  The Australian Courts have general supervisory jurisdiction over the Australian Proceeding, and there is substantial judicial oversight that can be invoked by interested persons, including the NewSat Debtors, creditors, the Administrators or the Australian Securities and Investments Commission.[41]

B.     The Australian Receivership Proceeding

22.     Based on the events of default described in paragraph 18, the Security Trustee was also authorized to appoint a receiver.  Each NewSat Debtor expressly agreed to permit the Security Trustee to appoint a receiver under the terms of the General Security Deeds.  On April 16, 2015, the Security Trustee, acting on behalf of the ECA Lenders, appointed Mr. Jason Preston and Mr. Matthew Wayne Caddy of McGrathNicol as receivers of each member of the NewSat Debtors (the "**Receivers**").  The primary role of the Receivers is to protect and recover property for the benefit of the secured creditors and return any surplus to the company.[42]  Under Australian law, the administration and receivership proceedings work in tandem, each with defined rights and responsibilities.[43]  Generally, the Receivers will manage and determine all issues relating to the assets and property of the NewSat Debtors, while the Administrators will handle the claims of creditors and are responsible for the administration process to be carried out in accordance with the Corporations Act.[44]

---

[39]  *Id*. at ¶ 10, 22.
[40]  Id. at ¶ 14.
[41]  *Id*. at ¶ 26.
[42]  *Id*. at ¶ 42.
[43]  *Id*. at ¶ 58.
[44]  *Id*.

01:16960555.6

**RELIEF SOUGHT**

23.     By this Chapter 15 Petition, the Administrators seek the following relief:

(A)     recognition, pursuant to section 1517 of the Bankruptcy Code, of the Australian Proceeding as a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code, or in the alternative, as a "foreign nonmain proceeding" as defined in section 1502(5) of the Bankruptcy Code;

(B)     all relief afforded foreign main proceedings automatically upon recognition pursuant to section 1520 of the Bankruptcy Code, including, without limitation, application of the stay imposed by section 362 of the Bankruptcy Code, or if the Australian Proceeding is a foreign nonmain proceeding, that this Court exercise its discretion to provide such relief;

(C)     application of section 365 of the Bankruptcy Code in these chapter 15 cases on a final basis pursuant to section 1521 of the Bankruptcy Code; and

(D)     such other and further relief as is appropriate under the circumstances pursuant to sections 105(a), 1507, and 1521, of the Bankruptcy Code.

**BASES FOR SUCH RELIEF**

*Recognition of Australian Proceeding*

24.     For the reasons more fully discussed in the Memorandum of Law filed contemporaneously herewith, the Australian Proceeding is entitled to recognition under section 1517 of the Bankruptcy Code because:

(A)     the Australian Proceeding is (i) a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code and (ii) a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code because the Australian Proceeding is pending in the location of the center of main interests for each of the NewSat Debtors;

01:16960555.6

(B)    each Administrator is (i) a "person" within the meaning of section 101(41) of the Bankruptcy Code and (ii) a "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code;

(C)    the Chapter 15 Petition was filed in accordance with sections 1504 and 1509 of the Bankruptcy Code; and

(D)    the Chapter 15 Petition meets the requirements of sections 1504 and 1515 of the Bankruptcy Code.

25.    Moreover, recognizing the Australian Proceeding would not be manifestly contrary to the public policy of the United States, as prohibited by section 1506 of the Bankruptcy Code.  In fact, granting recognition will promote the United States public policy of respecting foreign proceedings as articulated in, *inter alia*, sections 1501(a) and 1508 of the Bankruptcy Code and further cooperation between courts to the maximum extent possible as mandated by section 1525(a) of the Bankruptcy Code.  Thus, the circumstances satisfy the conditions for mandatory recognition of the Australian Proceeding under section 1517 of the Bankruptcy Code.

***Final Application of Section 365***

26.    In connection with the recognition of the Australian Proceeding as a "foreign main proceeding" and the corresponding application of section 362(a) to prevent the premature exercise of creditors' remedies, including contract termination, the Administrators seek an order applying sections 365 of the Bankruptcy Code in these chapter 15 cases on a final basis[45] pursuant to section 1521 of the Bankruptcy Code to enable the NewSat Debtors to maintain key contracts and make clear that counterparties cannot take advantage of insolvency-related termination provisions (i.e. *ipso facto* clauses).

---

[45]    By the Provisional Motion, the Administrators seek the application of section 365 in these chapter 15 cases on a provisional basis until the disposition of this Chapter 15 Petition.

27.     Section 1521(a) of the Bankruptcy Code provides that, upon recognition of a foreign proceeding, and "where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of any creditors, the court may grant any appropriate relief . . . ." 11 U.S.C. § 1521.  Such relief includes, among other things, "extending [provisional] relief granted under section 1519(a)" and "granting any additional relief that may be available to a trustee," with certain exceptions that are not relevant here.  *Id*.  Section 365 of the Bankruptcy Code offers critical protection to key contracts including preventing the termination of contractual relationships based solely upon financial condition, bankruptcy filings, or insolvency events, thereby enabling the debtor to continue as a going concern.  Section 365 applies as of right in plenary U.S. bankruptcy cases, and its application is warranted and necessary in these chapter 15 cases.  Without the preservation of contractual relationships, the NewSat Debtors are vulnerable to litigation from key contract counterparties which would impair the company's ability to continue operations and erode the NewSat Debtors' going concern value.  Indeed, various parties, such as Lockheed Martin and Arianespace, have already threatened to terminate contracts that are essential to the effective launch of Jabiru-1.  Given the precarious state of the NewSat Debtors' financial situation, such actions may have a snowball effect and reduce the chances of a successful outcome for the Australian Proceeding.

28.     Virtually the entirety of the NewSat Debtors' going concern value is inextricably intertwined with their critical contract rights under highly-specialized, nearly sole-source contracts.  Absent the entry of a temporary restraining order on an immediate basis and continued protection throughout these chapter 15 cases, the NewSat Debtors' rights under those critical contracts could be compromised thereby leading to devastating destruction of value.  The success of the Administrators' efforts to avoid harm and maximize and preserve the value of the estates will depend in large part on cooperation from the various constituencies.  In order to be in the best position to

accomplish the foregoing, the Administrators must have a stable platform at the outset of the chapter 15 cases so that it is clear contract counterparties and other creditors are stayed from enforcing rights against property in which the NewSat Debtors have an interest.

29.    Accordingly, this Court should apply section 365 of the Bankruptcy Code in these chapter 15 cases pursuant to section 1521 of the Bankruptcy Code.

## <u>CONCLUSION</u>

WHEREFORE, the Administrators respectfully requests that this Court grant this Chapter 15 Petition and enter the Proposed Order recognizing the Australian Proceeding as a "foreign main proceeding," applying section 365 of the Bankruptcy Code in these chapter 15 cases, and granting such other relief as is appropriate under the circumstances.

Dated: Wilmington, Delaware
       April 16, 2015

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

By: */s/ Joseph M. Barry*
Joseph M. Barry (Del. Bar No. 4221)
Matthew B. Lunn (Del. Bar No. 4119)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone (302) 571-6600
Facsimile (302) 571-1253
jbarry@ycst.com
mlunn@ycst.com

-and-

**ALLEN & OVERY LLP**
Ken Coleman
Mark Nixdorf
1221 Avenue of the Americas
New York, New York 10020
Telephone (212) 610-6300
Facsimile (212) 610-6399
ken.coleman@allenovery.com
mark.nixdorf@allenovery.com

*Attorneys for the Administrators*

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, Stephen James Parbery declares as follows:

I am a partner and duly authorized agent of PPB Advisory, which was appointed as administrator and authorized to act as foreign representative of NewSat Limited, NSN Holdings Pty Ltd, NewSat Services Pty Ltd., Jabiru Satellite Holdings Pty Ltd., NewSat Space Resources Pty Ltd., NewSat Networks Pty Ltd., and Jabiru Satellite Ltd.  I have full authority to verify the foregoing *Verified Petition for Recognition of Foreign Proceeding and Related Relief* (the "**Petition**").  I have read the Petition, and am informed and do believe that the allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this  16  day of April 2015, in  Sydney, Australia

Stephen James Parbery
Partner
PPB Advisory

19

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, Marcus William Ayres declares as follows:

I am a partner and duly authorized agent of PPB Advisory, which was appointed as administrator and authorized to act as foreign representative of NewSat Limited, NSN Holdings Pty Ltd, NewSat Services Pty Ltd., Jabiru Satellite Holdings Pty Ltd., NewSat Space Resources Pty Ltd., NewSat Networks Pty Ltd., and Jabiru Satellite Ltd.  I have full authority to verify the foregoing *Verified Petition for Recognition of Foreign Proceeding and Related Relief* (the "**Petition**").  I have read the Petition, and am informed and do believe that the allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this  16   day of April 2015, in  Sydney, Australia

Marcus William Ayres
Partner
PPB Advisory